THOMAS McCARGO *v.* THE MERCHANTS INSURANCE COMPANY OF NEW ORLEANS—EDWARD LOCKETT *v.* THE SAME.—APPLICATION FOR A RE-HEARING.

*F. B. Conrad, T. Slidell,* and *Bemjamin,* for a re-hearing. The court has recognized the principle that, under a policy on slaves, the assured will be answerable for a loss by insurrection; but an unexpected exception has taken our case out of the general rule. It is alleged as the main ground for not applying the principles " which the court has recognized as not unreasonable" and which might well be adopted as the proper rule, that there is a difference between our coasting slave trade and the foreign slave trade. It is not stated in what this difference consists. The court can have contemplated but two points of difference.

First, In the light in which the jurisprudence of this country would regard these two trades, did both now legally exist; and secondly, a difference in the disposition of the slave to revolt.

1st. Is there any difference in the light in which the jurisprudence of this country would regard these two trades, did both now legally exist ?

To simplify this inquiry, let us carry our minds back to the time when the foreign slave trade was tolerated by our laws.

Suppose the Creole, an American vessel, was navigating, before the year 1808, the waters of the Atlantic, on a voyage from the coast of Africa to Norfolk, laden with newly captured slaves.

Would the voyage be deemed an unlawful one ? Assuredly not; the terms of the constitution itself sanctioned it. " The navigation or *importation* of such persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year 1808; but a tax or duty may be imposed on such importation, not exceeding two dollars for each person."

Would not the Creole, in the supposed case, be just as much under the protection of the United States, as on her late voyage in 1841 ? Assuredly she would have been. If captured without just cause, by a vessel of war of a foreign nation at peace with us, would not the United States have been bound to claim indemnity? If unjustly detained or disturbed by such a vessel, would not the United States have demanded an apology or reparation ? See *Madrazo* v. *Willes,* 3 Barn. and Ald. 315, 316, in which the King's Bench uses the following language:

" Most of the states of Christendom, have now consented to

the abolition of the slave trade, and concurred with us in declaring it to be unjust and inhuman. The subjects of any of *these* states, could not, I think, maintain an action in the courts of the country, for any injury happening to them in the prosecution of this trade ; but Spain has reserved to herself a right of carrying it on in that part of the world where this transaction occurred. Her subjects could not legally be interrupted in buying slaves in that part of the globe, and have a right to appeal to the justice of this country for any injury sustained by them from such an interruption."

" These principles are confirmed by the decisions of the Court of Admiralty, and also by a judgment of Sir William Grant, pronounced at the cock pit. The cases to which I allude are, the Fortuna, the Donna Marianna, and the Dianna, in the Admiralty Court, and the Admedic, before the Privy Council.— Dodson's Ad. Rep. 81, 91, 95. These cases establish this rule, that ships which belong to countries that have prohibited the slave trade, are liable to capture and condemnation, if found employed in such trade ; but that the subjects of countries which permit the prosecution of this trade, cannot be interrupted while carrying it on. It is clear from these authorities, that the slave trade is not condemned by the general law of nations. The subjects of Spain have only to look to the municipal laws of their own country, and cannot be affected by any laws made by our government."

When the learned Mansfield was called upon as Chief Justice of the King's Bench, in the case of *Jones* v. *Schmoll* (1 T. R. 130,) to say who should bear the loss of slaves slain or mortally wounded, in an insurrection, from which wounds they subsequently perished, he did not institute any distinction between the direct and foreign trade from Africa, and the domestic trade between the British Colonies. Both were equally legal. He looked only to the contract, and because the written terms of the memorandum of the contract imposed the loss on the underwriters, he made the underwriters liable. By the policy in that case it was expressly declared, that the underwriters should pay for loss by mutiny, if it exceeded ten per cent. And his Lordship said, this policy is in the common form, *and if it were not for the memorandum I should say the case was not within the instrument.* But as it now stands, it is clear that those who were killed by the firing, or died in consequence of their bruises, are within the policy, and hence, under this instruction, the verdict was :

That all the slaves who were killed in the mutiny or died of their wounds, were to be paid for.

That all those who died of the bruises which they received

in the mutiny, though accompanied with other causes, were to paid for.

But the court seems to imply in its opinion, that the real test of distinction is this, viz : that in the foreign slave trade " the resistance of the captive might be regarded as any thing but criminal," whilst, as a converse proposition, the court seemed to assume that this resistance is criminal in the negro born in a state of slavery.

Now, if we concede this point to the fullest extent, we are utterly at a loss to conceive how this concession of fact can operate to fasten upon us the responsibility to which the decision of the court has subjected us.

Why are insurers, in the absence of express assumption of the risk, liable for criminal acts of a slave, who is the subject matter of insurance ?    Crime cannot exist without criminal motive. How can the human mind conceive of a loss proceeding more plainly and directly from a vice inherent in the subject matter, than one which is admitted to have originated from an act prompted by criminal motives in the being that is the subject matter of the insurance ?

In the foreign slave trade, as it is admitted by the court, the spirit that would prompt the negro to revolt is an inherent cause of loss, for which underwriters are not responsible.    In the domestic slave trade, is this cause less *inherent*, because *criminal ?* How can the morality or legality of the act affect the enquiry as to its *origin*—as to its being an intrinsic or extrinsic cause of loss ?

Let us now consider the next supposed point of difference, viz : a difference in the disposition of the slave to revolt.

Let us concede, for the purposes of argument, that the disposition of the slave to revolt and to obtain his liberty is stronger in the case of the new made slave, than in the slave who is born so, or who has long been in that condition.    Still it cannot be pretended that the desire of liberty is extinguished in the latter. All experience demonstrates the contrary.    The statute book of every slave-holding State in this Union rebukes such a pretention.    Is all the legislation of Louisiana with regard to the police of our slave population, an idle legislation, based upon visionary apprehension, upon unmanly and unreasonable fear ?    Certainly not.    The passionate desire for liberty exists in the bosom of of *every* slave—whether the recent captive, or him to whom bondage has become a habit, or was his destiny from birth.    It is then a mere difference of *degree*.

But the very moment that the loss actually happens from the inherent cause, whether the cause exists in a more or less violent degree, the result of the application of the legal principle

must of necessity be the same.    Fruit shipped when green, may
be less liable to rot, and thus to loss from inherent causes, than
if shipped when ripe ; yet that fact would scarcely be regarded
by a court as furnishing a basis for distinction in an enquiry as
to the liability of insurers.    Negroes born free may be more
ripe for revolt than negroes born in a state of slavery, and still
if the revolt does actually take place, it really seems to us
that no sound distinction can be made as to the result on the po-
licy of insurance.

Does the decision of the court then rest upon a solid and sub-
stantial legal basis ?  What is the rule which the decision sanc-
tions ?   It is an arbitrary rule and is this: In the case of the
newly captured slave, it is reasonable to throw the loss arising
from an insurrection upon the assured, because his desire for
liberty is very great.    In the case of the slave long habituated
to bondage, it is reasonable to throw the loss arising from an in-
surrection upon the underwriter, because the slave's desire for
liberty is not so *very* great.    If this contract then had been upon
an African voyage, and such a voyage were now legal (as it was
before 1808), we should throw the loss upon the owner ; but as
it is upon a domestic voyage and traffic, the loss must fall upon
the underwriter.

We respectfully hope that the court will pause before it incor-
porates so loose a rule in the law of insurance, a system justly
celebrated for its refined equity and logical accuracy, and to
which the recent learned decision of this court, in the case of the
Orleans Insurance Company, has made so valuable a contribu-
tion.

The points were expressly made in the printed brief, that
the policy at and from Richmond, if it ever attached, was
forfeited by deviation, before the Creole reached Abaco and the
insurrection occurred ; and also that the policy from Norfolk
never attached, because the negroes insured were not laden on
board there.

We supported both these points by authorities which we be-
lieved, and still believe, are clearly pertinent.  The court seems
to waive the application of these authorities to the present cases,
upon the ground that these points were not argued in the court
below ; and that, if they had been, the plaintiff might have cured
the difficulty by proof of usage.    This might be a reason to re-
mand these causes ; but not, we respectfully submit, to repel
the discussion altogether, and conclude the defendants.

Deviation need not be specially pleaded ; the non-lading at
the proper port need not be specially pleaded.    Both may be
set up under the general issue.    Of this there can be no doubt.
See Hughes on Insurance, p. 360.  " When the action is framed

in assumpsit, on a policy not under seal, the plea of the general issue will in general enable the defendant to avail himself of any matter of defence, either arising from illegality of the insurance, from an alteration of the policy after its execution, from a non-compliance with some express or implied warranty or condition, from the want of interest—a misrepresentation—a *deviation* or otherlike cause, from a release, or from a performance on his own part of the terms of the policy. But some matters of defence, which are not favored in law, must be specially pleaded—such as the insured becoming an alien enemy after the making of the contract or bringing the action; or the statute of limitations, when the action is not brought till after the lapse of six years."

What was the course of these proceedings and of the trial? The general issue was joined. The plaintiffs themselves offer evidence clearly establishing deviation in the one case, and, in the other, the non-lading of the slaves at Norfolk. The plaintiffs having themselves thus produced this testimony, we are debarred from all advantage to be derived from it, simply because, after the testimony was closed, we did not raise the point before the jury. Is the opinion of a jury conclusive upon such a point? If they had found the point either for us or against us, would this court have been absolutely concluded by their verdict ? Above all, is this court prepared to sanction the rule, that a point presented by a party's own testimony, can never be raised by his antagonist in this court, unless it was first raised in the court below ? If such is to be the rule, so let it be ; the bar will deferentially submit; but we are not aware that this court has ever so declared, in any other case.

Lastly. The point was expressly made by the defendants, that two of McCargo's slaves covered by the policy, viz: Rachael Glover and Mary arrived in safety at New Orleans, and were not lost. This is established by the evidence of Merritt. This point, in the discussion of much more important matters, has perhaps escaped the attention of the court. Allowance was made by the jury for one slave only. An additional allowance of $800 should be made.

BULLARD, J. In these cases a petition for a re-hearing has been presented, which we have attentively considered; the more so, as we desire not even to appear to innovate, in any thing which relates to the contract of insurance.

The counsel have not correctly understood us, if they suppose we meant to make the difference between the African slave trade, as it once existed, and the commerce between the State

of this Union in slaves, to consist in the desire, in a greater or less degree inherent in such persons, to escape from restraint and become free. We cannot but think there was a great difference between the two, when the slave trade was tolerated by the law of nations. The natives of Africa were guilty of no crime, when they resisted the attempt of the slaver to subject them to a servile condition. Under the constitution of the United States, slaves in those States where that institution, slavery, is permitted, are legitimate property, and if the mutineers on board the Creole had escaped into a non-slaveholding State, the master might have reclaimed them, and they might have been punished for the murder committed on board. A small part only of the slaves on board appear to have been engaged in the mutiny. Now, however plausible it may appear to apply to those few, the principle which relates to the natural decay or self-combustion of the subject matter insured, we do not clearly perceive how it can apply to the others who remained passive. On the contrary, we think, their forcible resistance to the authority of the master of the vessel on the voyage, was a peril within the policy.

Admit that under the plea of the general issue, in an action of assumpsit at common law, the enquiry might be gone into, whether there had been a deviation, and whether the policy ever attached, it only follows that evidence was admissible without any special defence. No evidence on either of these points was offered and rejected ; and from the evidence before the jury we are not authorised to pronounce that the verdict was so clearly wrong, as to justify our interference.

If the slave *Mary* was one of those insured, and she arrived safe, the title to her vested in the defendants by the abandonment ; and if she has in fact been retained by the plaintiff, the defendants' right to recover her, which is left doubtful, ought to be, and is hereby reserved.

It is, therefore, ordered, that the judgment first rendered, with the above reservation, be maintained, and the re-hearing refused.